I. Bertrand **CHERNIN**, and Myron
Chernin, Plaintiffs,

v.

Nancy **WELCHANS**, Defendant.

No. C85–109.

United States District Court,
N.D. Ohio, E.D.

Aug. 15, 1986.

Sheldon Stein, Cleveland, Ohio, for plaintiffs.

Donald K. Barclay, Director of Law, Jules N. Koach, Asst. Director of Law, Cleveland Heights, Ohio, for defendant.

Stephen M. Darlington, Stephen M. Bales, Ziegler, Metzger & Miller, Cleveland, Ohio, for amicus curiae Home Owners Ass'n and Ohio Apartment and Condominium Ass'n.

Philip D. Star, Cleveland, Ohio, for amicus curiae Cleveland Tenants Organization.

Fred J. Pompeani, Asst. Atty. Gen., Cleveland, Ohio, for amicus curiae State of Ohio.

## MEMORANDUM AND ORDER GRANTING JUDGMENT FOR THE PLAINTIFFS IN PART AND FOR THE DEFENDANT IN PART

KRENZLER, District Judge.

This case concerns allegations by the plaintiff-landlords that Ohio Rev. Code Ann. §§ 5321.07 *et seq.* act to deny them due process of law, equal protection of the laws and interfere with their right to contract. Those Code sections permit tenants to pay rent money into court-maintained escrow accounts when rental apartments are not being properly cared for by the owners. In particular, the plaintiffs contend that permitting the tenants to pay their rent into court, without a hearing first, is a violation of their due process rights. They seek injunctive and declaratory relief with findings that the rent-escrow Code provisions are unconstitutional and void.

The only remaining defendant in the action at this time is the Clerk of the Cleveland Heights Municipal Court (Clerk), who, in accordance with the provisions of the Code, accepted rent payments from tenants, owed to the plaintiffs, and placed them in an escrow account. The plaintiffs filed a motion for partial summary judgment based upon their claim that the Ohio statutory scheme permits the Clerk, a state actor, to deprive the landlords of their property without a constitutionally required pre-deprivation hearing. The Clerk opposed the motion arguing that she is not a state actor in the context of these Code sections and that even if she is, the process provided is constitutionally adequate.

A number of parties sought, and were granted, leave to participate in this action as *amici curiae*. Arguing to uphold the constitutionality of the rent-escrow Code provisions are the State of Ohio (Ohio) and the Cleveland Tenants Organization (CTO). Arguing that the provisions are unconstitutional are the Apartment and Home Owners' Association of Northeastern Ohio and the Ohio Apartment and Condominium Association (AHOA). On July 18, 1986, the Court held oral arguments on the pending motion where all of the parties and the *amici* were given an opportunity to state their positions on the record.

After careful consideration of the arguments of the parties and the *amici* and a thorough review of the relevant cases, the Court finds that, with one minor exception, the Ohio statutory scheme withstands constitutional scrutiny. The Court finds that all of the challenged provisions of the Ohio Code are constitutional except the provision which permits a trial on the landlord's complaint to take place more than sixty days from the time of the filing of that complaint. O.R.C. § 5321.09(B). Accordingly, the Court orders the last clause of the last sentence in O.R.C. § 5321.09(B), from the

word "unless" until the end of the sentence, stricken as unconstitutional.

## I. THE LANDLORD'S PROPERTY INTEREST

■ The CTO argues in its brief that when a landlord fails to properly maintain an apartment, that landlord has breached a covenant with the tenant and has therefore destroyed any property interest in the tenant's rent payment. The CTO also argues that the payment of rent money into the Court escrow account does not amount to a deprivation since the money is turned over to the landlord if it was wrongfully deposited. The Court rejects both of these arguments.

A landlord is liable for damages for failing to properly maintain an apartment. *Laster v. Bowman*, 52 Ohio App.2d 379, 391–392, 370 N.E.2d 767 (Cuyahoga Cty. 1977). Still, neither the statute nor the case law suggest that a breach of statutory obligations by the landlord relieves the tenant of the obligation to pay rent. In fact, the tenant *is* obligated to continue to pay rent even under the challenged sections of the Code; the rent may simply be paid to the Court instead of the landlord. *Id.*

The State of Ohio and AHOA both argue that the landlord maintains a property interest in rent payments even when the landlord fails to keep an apartment up to Code. The Court agrees The rent escrow procedure simply acts as a convenient avenue for the tenant to get damages from the landlord for the landlord's breach. When the rent is paid into Court, the Court determines how much of it is really owed to the tenant as a reduction in rent for any period that Code violations existed.

The landlord does not lose a property interest in rent money until a court has determined that the landlord has failed to properly maintain an apartment and that some or all of that rent money must be returned to the tenant. Until that time, the landlord's interest is substantial, a fact reinforced by the realization that the O.R.C. affords the landlord standing to sue in court to retrieve the escrowed rent money. Without a property interest in the money, the landlord would have no standing to sue to get it.

The landlord has a property interest in rent money until a court says otherwise. Thus, the payment of rent money into an escrow account either temporarily or permanently deprives the landlord of money in which he or she has an actual property interest.

The CTO also argues that the rent escrow does not amount to a deprivation because a determination that the money has been wrongfully escrowed will cause it to be turned over to the landlord. Furthermore, the CTO notes, the Code provides for the emergency release of rent money which is necessary to maintain the property. Again, the Court rejects this argument.

The deprivation of property, even for short periods of time, is still a deprivation. It is a fact of everyday life that inaccessability to money at a given point in time can be costly because of lost interest, lost opportunities or both. While AHOA's analogy to imprisonment is overly dramatic, there can be no doubt that the temporary deprivation of money or other property is a property deprivation which is protected by the Fourteenth Amendment. See, *Fuentes v. Shevin*, 407 U.S. 67, 84–85, 92 S.Ct. 1983, 1996–97, 32 L.Ed.2d 556 (1972) ("... it is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment.")

## II. THE CLERK AS A STATE ACTOR

■ The Clerk and the CTO argue that the property deprivation does not result from the actions of a state actor, the defendant Clerk, but from the actions of private tenants. These parties insist that once the tenant has elected to make use of the statutory remedy which deprives the landlord of property, the Clerk's participation is purely ministerial and can not properly be classified as state action.

For that proposition, the Clerk and the CTO rely on *Flagg Brothers, Inc. v.*

*Brooks,* 436 U.S. 149, 160 n. 10, 98 S.Ct. 1729, 1735–36 n. 10, 56 L.Ed.2d 165 (1978). In *Flagg Brothers,* the Supreme Court held that a private company which sought to invoke a state statute which authorized the sale of others' property stored in its warehouse could not properly be classified as a state actor simply by making use of the state statute. But, reliance on *Flagg Brothers* is misplaced since it focuses exclusively on the question of when a private actor can properly be considered a state actor as the result of its entanglement with state actors or state functions.

In two places in the *Flagg Brothers* decision, the Supreme Court qualifies its position in a manner which clearly cuts against the instant "no state actor" argument. Just prior to the portion of the decision cited in the CTO's brief, the Court noted:

> It would intolerably broaden, beyond the scope of any of our previous cases, the notion of state action under the Fourteenth Amendment to hold that the mere existence of a body of property law in a State, whether decisional or statutory, itself amounted to "state action" *even though no state process or state officials were ever involved in enforcing that body of law.*

436 U.S. at 160 n. 10, 98 S.Ct. at 1735–36 n. 10 (emphasis added). Earlier, the Court had said:

> It must be noted that respondents have named no public officials as defendants in this action. The city marshal, who supervised [the plaintiffs'] evictions, was dismissed from the case by the consent of all the parties.[5] This total absence of overt official involvement plainly distinguishes this case from earlier decisions . . .

436 U.S. at 157, 98 S.Ct. at 1734. Footnote five of the *Flagg Brothers* decision, which was presented as the counterpoint to the above language, says:

> Of course, where the defendant is a public official, the two elements of a § 1983 action merge. "The involvement of a state official . . . *plainly provides the state action essential to show a direct*

*violation of petitioner's Fourteenth Amendment . . . rights . . ."*

436 U.S. at 157 n. 5, 98 S.Ct. at 1734 n. 5 (citations omitted, emphasis added).

The Clerk is undeniably a state actor responsible for the deprivation of the plaintiffs' property. See, *United States v. Wiseman,* 445 F.2d 792 (2nd Cir.1971) ("There is no doubt that the Clerk of the New York City Civil Court, New York County, is an employee of an agency of a subdivision of New York State, and acts 'under color of state law.' ") The only substantial issue in this case is whether a pre-deprivation hearing is constitutionally mandated or whether the post-deprivation procedures currently provided are adequate to comply with constitutional due process requirements.

## III. SATISFACTION OF DUE PROCESS

■ In the end, all of the parties seem to recognize that the resolution of this case requires an application of the balancing test first stated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In *Mathews,* the Supreme Court held that in order to satisfy due process requirements, the court must balance the interests of all those affected. The factors to be balanced are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903.

If, after the balancing, the government's interest in the post-deprivation procedure is large enough and the risk of erroneous deprivation is small enough to outweigh any injury to the private interest affected, the post-deprivation procedure will be upheld. In other words, when the above interests weigh in favor of a pre-deprivation

hearing, as the *Mathews* court held was the case in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (which rejected the sufficiency of post-deprivation hearings regarding the cessation of need-based welfare payments), post-deprivation hearings will be judged inadequate and pre-deprivation hearings will be mandated. But when the interests tip the scale the other way, the acceptability of post-depri-vation hearings will be readily upheld, as was the case in *Mathews* (which accepted the sufficiency of post-deprivation hearings regarding the cessation of non-need-based disability payments).

## A. PRIVATE INTEREST AFFECTED

The heavy reliance of the plaintiffs on the pre-*Mathews* cases like *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), *Mitchell v. W.T. Grant*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), and *North Georgia Finishing v. Di-Chem*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975) is misplaced for two reasons. First, those cases do not employ the now firmly entrenched *Mathews* bal-ancing test. While they may provide some guidance, the standard for judging the ade-quacy of due process now applied by the Courts evolved only after those cases were decided.

But the second, and perhaps more impor-tant reason that reliance on those cases is misplaced is that by considering their facts, and the facts in a number of post-*Mathews* cases cited by both parties, one can see a pattern which significantly undercuts the position of the plaintiffs in this action.

In each of the major pre-deprivation ver-sus post-deprivation cases, substantial em-phasis is placed on the first prong of the balancing test. The courts have given great weight to deprivations which sub-stantially interfere with a private individu-al's daily existence. When those who are substantially lacking in education, re-sources, and societal power in general are deprived of property by the challenged pro-cess, the courts have been skeptical about permitting that process to continue. On

the other hand, substantially less weight has been attached to this first element of the balancing test when the deprivation is less significant or more easily managed by the individual affected.

In the instant case, when considering the first prong of the *Mathews* test there are two private interests to be placed on oppo-site sides of the scale. The landlord claims an interest in the immediate use of rent money with which he maintains the proper-ty and makes a living. The tenant claims an interest in a habitable dwelling. These interests are obviously substantial, but ex-amination beneath the surface is necessary to determine how much weight they each deserve.

The plaintiff-landlords seek to compare their deprivation to those of the aggrieved plaintiffs in the various cited cases. The Court finds these analogies to be strained.

In *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the plain-tiff had his household belongings seized. In *Memphis Light, Gas, & Water Division v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), the plaintiffs suffered shut-offs of their utilities. In *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1920, 23 L.Ed.2d 349 (1969), the plain-tiff's wages were garnished because of his inability to pay certain bills. In *Mitchell v. W.T. Grant*, like in *Fuentes*, the plaintiff's furniture was repossessed for his falling behind on the payments. And in *Simler & Jackson v. Jennings*, 23 Ohio Ops.3d 554 (S.D. Ohio 1982) (Aug, U.S. Magistrate) the bank account of an 85 year old man, con-sisting solely of Veteran's benefits and So-cial Security benefits, was garnished after an attorney obtained a default against him for an alleged failure to pay certain attor-neys fees.

In each of these cases, the court recog-nized the substantial interest of the private plaintiff and the extraordinary hardship worked by the deprivation. The sugges-tion that the temporary deprivation of land-owner's rent money rises to the level of the deprivations described above is difficult to accept. Further, it is undeniable that the

interest of the tenant in habitable shelter, which complies with the minimum standards provided by state law, is an interest with very great weight.

The landlords' claims about hardships they will suffer from the temporary deprivation of rent payments—landlords to whom the statute does not apply unless they own more than three rental units—pale in comparison to the hardships worked upon tenants forced to live in shelter which is violative of the minimum housing standards set by law. Furthermore, the Code permits the landlord to seek a partial release of funds prior to a determination on the merits of the landlord's request for the complete release funds. This partial release is permitted so that the landlord can make mortgage, insurance, tax, and other payments necessary for the maintenance of the property. O.R.C. § 5321.10(A).

Still, there is no guarantee in the statute that the landlord's request for partial release of funds will be heard prior to adjudication on the merits. Under the statute, adjudication on the merits must come within sixty days of the filing of the landlord's complaint for the release of funds, *unless for good cause shown the court continues that trial date.* O.R.C. § 5321.09(B).

On the whole, the Court finds it difficult to compare the temporary deprivation with which this case is concerned, and a deprivation of non-need based disability benefits (*Mathews*), let alone a deprivation of need-based welfare payments (Goldberg). In addition, the Court notes that post-deprivation hearing procedures need not be free from hardships to withstand scrutiny. In *Mathews*, the court noted that "... the hardship imposed upon the erroneously terminated disability recipient may be significant. Still, the disabled worker's need is likely to be less than that of a welfare recipient." 424 U.S. at 342, 96 S.Ct. at 906. Thus, even though the post-deprivation system worked a "significant" hardship on the plaintiff in *Mathews*, the procedure still withstood constitutional attack.

While this Court would prefer a statutory scheme which mandated an early hearing on a landlord's request for partial release of funds, the Court's function is not to determine what would be the best possible legislation, but to determine what legislation is constitutionally permissible. The statutory scheme created by the Ohio legislature which requires the resolution of a rent-deposit issue within sixty days of the filing of the landlord's complaint is more than sufficient to minimize the risks and harms of an erroneous deprivation. The open-ended ability for the courts to extend that time is not.

While the statute provides that time may only be extended for "good cause shown", as a practical matter, those familiar with the courts recognize that "good cause" for continuances has come to mean any cause and sometimes no cause at all. The ease with which courts grant continuances substantially lessens the certainty of the landlord's case being heard on the expedited basis theoretically demanded by the statute. (See, *Fusari v. Steinberg,* 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975), "the possible length of [the] wrongful deprivation ... is an important factor in assessing the impact of official action on the private interests.")

The Court finds the private interests of the tenant, protected by the statute, to be great. The Court finds the interests of the landlord to be minimal if expeditious post-deprivation hearings are held. But the statute does not sufficiently guarantee that an unwarranted deprivation will be brief and that a post-deprivation hearing will be expeditiously held. Accordingly, the Court finds the landlord's private interest to substantially interfered with by the present statutory scheme.

## B. RISK OF ERRONEOUS DEPRIVATION

The statute contains a number of safeguards designed to minimize erroneous deprivations. First, the tenant is required to notify the landlord, in writing, that repairs are needed, at least thirty days before rent may be paid into an escrow account. O.R.C. § 5321.09. In addition, to avoid ten-

ants behind in rent payments from threatening to place their future rent in escrow, hoping that the threat will force the landlord to waive back rent, the tenant must be current in rent payments before an escrow deposit is permitted. *Id.*

Still there can be no question that the existing statutory scheme allows for erroneous deprivations. The malicous tenant can, with no basis whatsoever, pay rent into a court escrow without compliance with the above statutory requirements. But there are consequences for doing so.

Under the challenged Code sections, bad faith by the tenant provides the landlord with an action for damages, costs, and attorney fees. O.R.C. § 5321.09(D). Thus, the risk of the malicious tenant abusing the statutorily provided rights is minimized by the redress afforded the landlord.

In addition, in Cleveland Heights, the defendant Clerk has taken the reasonable step of requiring tenants depositing rent there to sign an affidavit swearing that the statutory preconditions to rent escrow have been met. This requirement is implicitly permitted by the statutory requirements and helps to reduce the risk of erroneous deprivations.

The plaintiff-landlords insist that the notice provided to them by tenants prior to a rent deposit is insufficient to meet constitutional notice standards. The Court disagrees.

Notice requirements exist, in part, to permit one about to be deprived of property to challenge the propriety of the deprivation before it happens in hopes of preventing erroneous deprivations. The plaintiffs claim that the challenged statutory process, which they claim relies exclusively on the notice provided by the tenant to the landlord prior to the deprivation, is insufficient to meet that need.

But rather than focusing attention on one individual aspect of the process, the Court must consider the process as a whole in order to determine its constitutional adequacy. The challenged system affords more pre-deprivation safeguards than just the tenant's notice, since, as discussed above, there are consequences to the tenant for wrongful rent depositing. The Court finds, when the process is considered in its entirety, that the notice provided is reasonably likely to forward the goal of reducing the risk of erroneous deprivations and is constitutionally adequate.

The landlords also insist that the lack of a pre-deprivation hearing with a neutral magistrate inherently gives rise to an excessive risk of erroneous deprivation. With this, too, the Court disagrees.

The very purpose of the *Mathews* test is to determine to what extent a pre-deprivation hearing is mandated. Even the cases cited by the plaintiffs recognize that pre-deprivation hearings are not universally required. If they were, this case would be an easy one. (See, Plaintiffs' Brief re: Summary Judgment, p. 11, citing *Lee v. Western Reserve*, 747 F.2d 1062 (6th Cir.1984) for the proposition that post deprivation hearings are generally inadequate, *absent the need for quick state action or the impracticality of pre-deprivation remedies;* see also, Plaintiffs' Supplemental Brief, p. 6, citing Professor Tribe for the proposition that pre-deprivation hearings should be held *unless* there is a valid governmental interest which justifies postponing the hearing until after the deprivation has taken place).

Erroneous deprivations could theoretically be reduced by implementing a system of pre-deprivation hearings. Still, there is no evidence before the Court to demonstrate what level of error, if any, exists with the current system. The current systems contains procedures designed to reduce the risk of erroneous deprivations. Without a showing that improper rent deposits are common today, the Court is unable to find that the implementation of pre-deprivation hearings would have any substantial value in terms of reducing the risk of erroneous deprivations. Accordingly, the Court finds that the second prong of the *Mathews* test militates somewhat in favor of the constitutionality of the current process.

## C. THE GOVERNMENT'S INTEREST

There is a substantial government interest in having disputes between private citizens resolved with as little governmental intervention as possible. Dispute resolution by private citizens without governmental intervention is less costly to the private citizens concerned and less costly for the taxpayers in general. While some disputes are simply not amenable to private resolution, the Ohio Legislature has attempted to fashion a process for dealing with landlord-tenant disputes which minimizes governmental participation.

The Ohio Legislative scheme for the resolution of landlord-tenant disputes relies first on the private resolution of such disputes. Tenants are required to notify landlords, in writing, regarding repairs which they contend need to be made. Landlords may make the requested repairs, reach an agreement with the tenant about some repairs which need to be made or do nothing at all.

Tenants who are still dissatisfied about conditions more than thirty days after giving notice to the landlord, who are also current in their rent, may deposit their rent from that point forward in an escrow account maintained by the local municipal court. At this state of the dispute resolution process, government participation is still minimal. The opportunity for the tenant and the landlord to resolve the matter themselves is advanced by a neutral third-party, the Court, holding the rent money until the dispute is resolved.

Only if these first two stages fail must there be substantial governmental participation in the resolution of the dispute. Once the rent has been paid into an escrow account, the landlord may then file a complaint with the municipal court holding the rent money, requesting that the money be released.

At this point in the dispute resolution procedure, the municipal court moves from its role as an impartial holder of funds to an impartial decisionmaker. The decision-making role is accompanied by all of the costs inherent in judicial decision-making to both the taxpayers and the parties concerned.

The plaintiffs and AHOA propose, as an alternative to the existing statutory procedure, that the tenant simply file suit against the landlord when conditions are allegedly violative of the state housing code. That way, the landlord would never be deprived of rent money before an adjudication on the merits of the tenants claim.

While this alternative would clearly serve the landlord's interests it poses a number of problems. First, it would dramatically add to the "administrative and fiscal burdens" which the *Mathews* case requires this Court to examine as part of the third prong of the balancing test.

Under such a system, the initial phases of dispute resolution, which require virtually no governmental participation, would be all but eliminated. Costly lawsuits between the disputants would be the only alternative rather than the last alternative after others had been exhausted. Thus, in terms of the "administrative and fiscal burdens" analysis required by *Mathews*, the proposed alternatives suggest that great weight should be given to maintaining the existing system.

The *Mathews* test's third prong also requires an examination of the broader governmental interest, the governmental policy being advanced by the challenged statutory scheme. Here, as the State, the CTO, and the defendant Clerk all point out in their briefs, the Ohio legislature has enacted a statutory process designed to provide tenants with a simple and inexpensive method of requiring landlords to maintain apartments in the manner required by the state housing laws. Thus, the challenged code sections are an integral part of the state housing code which, in turn, is designed to protect the health and safety of Ohio citizens.

The challenged code sections are one of the key enforcement mechanisms of laws prohibiting hazardous housing conditions. It is the simplicity and lack of expense which makes the challenged sections effec-

tive. The alternative proposed by the plaintiffs and AHOA would add expense, might require more participation by attorneys, would require expenditure of time by tenants which might not have been required under the existing statutory plan, and generally would add cost and complexity to the system.

The end result of added cost and complexity would, in all likelihood, be a reduction in the use of the system by tenants and a concomitant reduction in the enforcement of the state housing codes. In addition to the added costs and reduction in enforcement likely under the alternative proposals of the plaintiffs, repairs of hazardous and unhealthy conditions would be delayed during the pendency of lawsuits—lawsuits which might have been avoided under the existing statutory process. Delays in repairs and less enforcement translates into a reduction in the health and safety of the Ohio citizenry, thus defeating the substantial governmental policy interest in the existing statutory scheme.

The state government's interest in the existing statutory provisions is substantial and proposed alternatives would unreasonably interfere with the policies advanced by existing law. Proposed alternatives would also significantly add to the fiscal and administrative burdens of municipalities throughout the state, making the alternatives particularly difficult to justify in this era of governmental fiscal austerity.

The third prong of the *Mathews* test weights heavily in favor of maintaining the current statutory plan. Substantial weight from the first two *Mathews* would be necessary to overturn existing law.

## IV. THE BALANCING

■ The Court has found that the landlord's interest in the immediate accessibility to liquid assets—the rent money—is a cognizable consititutional interest. Further, the Court has found that that interest is not substantial as long as any wrongful deprivation is only temporary and redress for an erroneous deprivation is provided in a timely manner. The Court has also found that the private interests of the tenant affected by this statute are substantial and should not be interfered with lightly. Finally, with regard to the first prong of the *Mathews* test, the Court has found that the discretion invested in the municipal courts regarding when a claim by the landlord must be determined is too broad and, as a practical matter, is insufficient to guarantee the rapid redress of an erroneous deprivation required by the constitution.

With regard to the second prong, the Court has determined that the risk of an erroneous deprivation is not particularly high, although the risk could be reduced through the institution of a pre-deprivation procedure. Finally, with regard to the third prong of the *Mathews* test, the Court has determined that the governmental interest in the existing statutory scheme is extremely high and that proposed alternatives would substantially interfere with the government interests served by existing law.

On balance, the Court finds that because the statutory scheme fails to provide the landlord with a sufficient guarantee of rapid redress for erroneous deprivation, an alteration in the statutory scheme is required. Without the sixty-day cut-off imposed by the legislature being a firm one, due process rights simply are not protected.

The Sixth Circuit recently noted that "The Supreme Court has held that invalid portions of the statute should be severed unless it is clear that the Legislature would not have enacted those provisions which are constitutional, independent of those provisions which are not." *Plain Dealer Publishing Co. v. City of Lakewood,* 794 F.2d 1139 (6th Cir.1986). In that case, the court also noted that "a provision is presumed severable if what remains after severance is fully operative as a law." *Id.* at 1147.

Here, the Court finds it necessary to sever the last clause of the last sentence of O.R.C. § 5321.09(B) beginning with the

word "unless". While the legislature undoubtedly wished to protect those who might not be ready for trial and needed more time, or the court with the heavily back-logged docket, some compromises and prioritization are necessary to protect constitutional rights. Landlords who are not ready to proceed at the time of trial may seek continuances from the court, but would waive any due process challenge if they were to do so. These cases are relatively uncomplicated and little pretrial preparation should be necessary.

With that alteration, the statute withstands full constitutional scrutiny. The legitimate private interests of the landlord are respected with a statutory process which minimizes erroneous deprivations and provides rapid relief when they do occur, while simultaneously respecting the strong interests of the tenant and the State. The minimal pre-deprivation procedures are constitutionally adequate given the checks imposed by the statute against wrongful rent deposits, the modest extent to which the landlord's interests are affected, and the speedy post-deprivation procedures provided.

## V. THE PROCEDURAL POSTURE OF THIS CASE

In oral argument, the plaintiffs noted that their challenge in this action was on due process grounds and was only to the statute on its face, not as applied. All non-due process claims advanced in the plaintiffs' complaint were abandoned in the plaintiffs' briefs and oral argument.

In essence, the plaintiffs concede, by mounting their challenge only against the statute on its face, that if the statute is constitutional on its face, they have no complaint about the way in which it was applied. They simply insist that its application in this case, and in every case, is impermissable because its provisions are inherently unconstitutional.

Pending before the Court is the plaintiffs' motion for partial summary judgment regarding the constitutionality of the challenged code provisions. Since that is the only remaining issue in this action, to the extent that the statute is unconstitutional, the Court must grant judgment for the plaintiffs. To the extent the statute withstands constitutional scrutiny, the Court must grant judgment for the defendant Clerk. None of the factual disputes which exist in the evidentiary materials submitted by the parties are "material issues of fact" since the constitutionality of the law on its face is a legal, not a factual determination. (See, *Betts v. Coltes*, 467 F.Supp. 544, 596 (D.Hawaii 1979), for the proposition that the Court may grant summary judgment for a non-moving party when the motion must be resolved for that party as a matter of law.)

The Court has determined that the last clause of O.R.C. § 5321.09(B), from the word "unless" until the end of the sentence, is unconstitutional on its face. Therefore, the Court grants the plaintiffs' request for declaratory judgment regarding the constitutionality of that sole provision of the challenged Code sections, declares that clause to be unconstitutional, and orders it stricken and considered null and void. In all other respects, the Court has found the challenged Code provisions to be constitutional on their face and accordingly grants judgment for the defendant Clerk on all remaining claims in this action.

All parties shall pay their own costs and attorneys fees.

IT IS SO ORDERED.